**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**PAULA SAUNDERS,**

     **Plaintiff,**

**vs.**                                         **Case No.  4:14cv83-MW/CAS**

**CAROLYN W. COLVIN,
Acting Commissioner of the Social
Security Administration,**

     **Defendant.**

_____/


## REPORT AND RECOMMENDATION

This is a Social Security case referred to the undersigned magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.2(D).  It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Acting Commissioner (Commissioner) of the Social Security Administration (SSA) denying Plaintiff's application for a period of disability and Disability Insurance Benefits (DIB) filed pursuant to Title II of the Social Security Act (Act).  After consideration of the record, it is recommended that the decision of the Commissioner be affirmed.

**I.  Procedural History**

On June 28, 2011, Plaintiff, Paula Saunders, filed an application for DIB alleging disability beginning May 12, 2011, due, in part, to heart and back problems, hypothyroidism, severe hypertension, osteoarthritis, diverticulosis, anxiety and

depression, and severe muscular spasm.[1]  R. 23, 28, 100, 135, 142, 188-91, 218, 232, 269, 273, 280.  (Citations to the Record shall be by the symbol ("R") followed by a page number that appears in the lower right corner.)  Plaintiff also said she stopped working because she was "absent from work and had [a] disagreement with her supervisor, felt ill during the discussion and decided to end her employment."  R. 232.  Administrative Law Judge (ALJ) Janet McCamley determined Plaintiff's date last insured (DLI) for DIB as December 31, 2013.  R. 23; *see* R. 100, 218, 275, 286.  Plaintiff states that her DLI is March 30, 2014.  Doc. 16 at 2 n.1; *see* R. 199 (work record; "DRC Insured Date: 03/14").

Plaintiff's application was denied initially on October 4, 2011, and upon reconsideration on December 6, 2011.  R. 23, 100-27, 130-42.  On January 11, 2012, Plaintiff requested a hearing.  R. 23, 144-51.  On May 9, 2013, the ALJ held a hearing in Tallahassee, Florida.  R. 23, 40-99.  Plaintiff testified.  R. 23, 50-90.  Gail E. Jarrell, an impartial vocational expert, testified during the hearing.  R. 23, 91-99, 177-79 (Resume).  Plaintiff was represented by Leanne J. Little, a non-attorney representative.  R. 23, 128-29.  On May 22, 2013, the ALJ entered a decision and denied Plaintiff's application for benefits concluding that Plaintiff was not disabled from May 12, 2011, through the date of her decision.  R. 23-34.

On July 26, 2013, Heather Freeman, an attorney, on behalf of Plaintiff, requested review of the ALJ's decision, R. 8-12, and on October 21, 2013, filed a brief, R. 308-10 (Exhibit 21E), and additional evidence, R. 706-791 (Exhibits 23F-28F).  On December 18, 2013, the Appeals Council considered the reasons Plaintiff disagreed with the ALJ's

---

[1]  Plaintiff was born in 1948 and was a person closely approaching retirement age on her alleged onset date of disability.  R. 28.

decision and the additional evidence, but concluded "that this information does not provide a basis for changing the [ALJ's] decision."  R. 1-6.  The Appeals Council denied Plaintiff's request for review of the ALJ's decision making the ALJ's decision the final decision of the Commissioner.  R. 1-6; *see* 20 C.F.R. § 404.981.

On February 20, 2014, Plaintiff, by counsel, filed a Complaint with the United States District Court seeking review of the ALJ's decision.  Doc. 1.  The parties filed memoranda of law, docs. 16 and 17, which have been considered.

## II. Findings of the ALJ

The ALJ made several findings relative to the issues raised in this appeal:

1. "The claimant meets the insured status requirements of the Social Security Act through December 31, 2013."  R. 25.

2. "The claimant has not engaged in substantial gainful activity since May 12, 2011, the alleged onset date."  R. 25.

3. "The claimant has the following severe impairments: morbid obesity; history of chronic low back pain; right shoulder arthropathy; mild degenerative spurring of the right hip; and cardiomyopathy."  *Id.*  At step two, the ALJ considered the effects of Plaintiff's obesity in formulating Plaintiff's residual functional capacity (RFC) and found her obesity to be severe.  R. 25.  The ALJ considered Plaintiff's history of hypothyroidism and hypertension, Plaintiff's irritable bowel syndrome, and Plaintiff's workers' compensation knee injury, and determined they were not severe impairments.  R. 25-26.  The ALJ also considered the Plaintiff's medically determinable mental impairments of depression and anxiety in light of the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments.  R. 26-27.  The ALJ determined that Plaintiff had *mild* limitations in activities of daily living, social functioning, and in concentration, persistence, or pace, and that Plaintiff had not experienced any episodes of decompensation which have been of extended duration.  *Id.*

4. "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  R. 27.

5. "[T]he claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) except she cannot climb ladders, ropes or scaffolds.  She can

tolerate no exposure to heights or dangerous machinery.  She is limited to occasional overhead reaching with her right arm.  She can perform no overhead lifting of more than five pounds with the right upper extremity. R. 27.

6. "The claimant is capable of performing past relevant work as a teacher's aide and a daycare worker.  This work does not require the performance of work-related activities precluded by the claimant's [RFC]."  R. 33.  The vocational expert testified "that the claimant has been capable of performing past work as a teacher's aide II and as a daycare worker, as actually performed and as generally performed in the national economy, subject to the limitations specified in the" RFC.  *Id.*; *see* R. 91-99.[2]

7. "The claimant has not been under a disability, as defined in the Social Security Act, from May 12, 2011, through the date of" the ALJ's decision. R. 34.

## III.  Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by

substantial evidence in the record and premised upon correct legal principles.

42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial

evidence is more than a scintilla, but less than a preponderance.  It is such relevant

evidence as a reasonable person would accept as adequate to support a conclusion."

Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord

---

[2]   The vocational expert described the teacher's aide II job as a light job with a Specific Vocational Preparation (SVP) of 3, which is semi-skilled, and the daycare worker job as a light job with an SVP of 4.  R. 33, 95-98.  "Semi-skilled work is work which needs some skills but does not require doing the more complex work duties. Semi[skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment , property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work.  A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks."  20 C.F.R. § 404.1568(b).  An SVP of 3 means "[o]ver 1 month up to and including 3 months."  Dictionary of Occupational Titles (DOT) (4th Ed., Rev. 1991), Appendix C: Components of the Definition Trailer, § II, SVP.  An SVP of 4 means "[o]ver 3 months up to and including 6 months."  *Id.*  In part, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).

Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).  The court may not reweigh the evidence or substitute its own judgment for that of the ALJ even if it finds that the evidence preponderates against the ALJ's decision.  Moore, 405 F.3d at 1211.[3]

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'"  Bloodsworth, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

---

[3]  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'"  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement).

Both the "impairment" and the "inability" must be expected to last not less than 12

months. Barnhart v. Walton, 535 U.S. 212 (2002). In addition, an individual is entitled

to DIB if she is under a disability prior to the expiration of her insured status. *See* 42

U.S.C. § 423(a)(1)(A); Moore, 405 F.3d at 1211; Torres v. Sec'y of Health & Human

Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health &

Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 404.1520(a)(4)(i)-

(v).

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.      Does the individual have the residual functional capacity (RFC) to perform work despite limitations and are there any impairments which prevent past relevant work?[4]

5.      Do the individual's impairments prevent other work?

---

[4] An RFC is the most a claimant can still do despite limitations. 20 C.F.R. § 404.1545(a)(1). It is an assessment based upon all of the relevant evidence including the claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records. *Id.* The responsibility for determining claimant's RFC lies with the ALJ. 20 C.F.R. § 404.1546(c); *see* Social Security Ruling (SSR) 96-5p, 1996 SSR LEXIS 2, at *12 (July 2, 1996) ("The term "*residual functional capacity assessment"* describes an adjudicator's finding about the ability of an individual to perform work-related activities. The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence.").

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work. If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.  If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v), (e) & (g).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

As the finder of fact, the ALJ is charged with the duty to evaluate all of the medical opinions of the record resolving conflicts that might appear.  20 C.F.R. § 404.1527.  When considering medical opinions, the following factors apply for determining the weight to give to any medical opinion: (1) the frequency of examination and the length, nature, extent of the treatment relationship; (2) the evidence in support of the opinion, such as "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight" that opinion is given; (3) the opinion's consistency with the record as a whole; (4)

whether the opinion is from a specialist and, if it is, it will be accorded greater weight; and (5) other relevant but unspecified factors.  20 C.F.R. § 404.1527(b) & (c).

The opinion of the claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  This is so because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 404.1527(c)(2).  "This requires a relationship of both duration and frequency."  Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003).

The reasons for giving little weight to the opinion of the treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated.  Phillips, 357 F.3d at 1241.  "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error."  MacGregor, 786 F.2d at 1053.

The ALJ may discount a treating physician's opinion report regarding an inability to work if it is unsupported by objective medical evidence and is wholly conclusory.  Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991).  Stated somewhat differently, the ALJ may discount the treating physician's opinion if good cause exists to do so.  Hillsman v. Bowen, 804 F. 2d 1179, 1181 (11th Cir. 1986).  Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supports a contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks

persuasive weight," the opinion is "inconsistent with [the treating physician's own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence."  Lewis, 125 F.3d at 1440; Edwards, 937 F.2d at 583 (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)).  Further, where a treating physician has merely made conclusory statements, the ALJ may afford them such weight to the extent they are supported by clinical or laboratory findings and are consistent with other evidence as to a claimant's impairments.  Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).

Plaintiff bears the burden of proving that she is disabled, and consequently, is responsible for producing evidence in support of her claim.  *See* 20 C.F.R. § 404.1512(a); Moore, 405 F.3d at 1211.

## IV.  The Evidence

### A.  The Medical Evidence

A May 12, 2006, cardiac catheterization revealed mild, non-obstructive coronary artery disease.  R. 342-43.  A May 13, 2006, echocardiogram identified normal left ventricular systolic function; left ventricular diastolic dysfunction; right ventricular systolic function; trace mitral regurgitation, and mild pulmonary hypertension.  R. 340-41.

On November 9, 2006, Leonard Leichus, M.D., performed a colonoscopy on Plaintiff resulting in two impressions – small hemorrhoidal plexus and colon diverticula. R. 327; *see* R. 328 (Sept. 8, 2004, colonoscopy with similar impressions); R. 321-322 (Nov. 30, 2006, and Jan. 16, 2007, follow-up visits); R. 330-31 (Nov. 16, 2009,

pathology report of specimens from Plaintiff duodenum, gastric mucosa, and esophageal).

On December 1, 2008, Brian Deem, M.D., Plaintiff's primary care provider, completed paperwork requesting an apartment for the handicapped due to Plaintiff's dizziness when reaching over her head.  He noted this was "not because of a permanent disability but basically for safety reasons."  R. 533; *see* R. 526-37 (April 21, through Sept. 22, 2009, for follow-up visits with Dr. Deem or another health care provider).  On November 3, 2009, Plaintiff was prescribed Lexapro for depression and anxiety, which improved her symptoms.  R. 524-25.

On November 16, 2009, Dr. Leichus performed an esophagogastroduodenoscopy with Maloney dilation and a colonoscopy and several impressions are noted including distal esophagitis, distal esophageal ring status post dilation to 54-French, hiatal hernia, gastritis, internal hemorrhoids, and colonic diverticula.  R. 325.  On December 1, 2009, Plaintiff had a CT of her abdomen with contrast.  R. 335.  The impression was: "No acute intradominal pathology identified."  *Id.* Plaintiff had follow-up visits with Dr. Leichus in 2009 and 2010.  *See, e.g.*, R. 315-19. By August 23, 2010, Dr. Leichus continued Plaintiff on WelChol in order to give her full resolution of her post prandial diarrhea.  Plaintiff was also given a prescription for HyoMax be used as needed for abdominal cramping.  R. 315.

In April 2010, Plaintiff fell at work and sought treatment with J.T. Brown, M.D., for left knee pain.  R. 313-14.  On examination, Plaintiff had full range of motion (ROM); mild tenderness to valgus and varus stress; Lachman's test was negative; majority of her tenderness was anterior to her knee just below the patella; and primarily a contusion

of the anterior knee.  R. 313.  Dr. Brown noted he would get an MRI and that Plaintiff

should call workers' compensation to find out where the MRI could be done and the

cost.  *Id.*

On May 17, 2010, Plaintiff saw Dr. Deem due to continued right shoulder pain.

Upon examination, Dr. Deem noted 1+ edema with a little bit of inflammation and pain

with range of motion.  An injection was provided.  R. 518.

On May 20, 2010, Plaintiff returned to Dr. Brown due to continuing left knee pain.

R. 311-12.  Dr. Brown noted an MRI revealed an MCL (ligament) sprain, but no other

acute issues.  *Id.*  However, he noted Plaintiff had "some chronic knee issues

specifically mild lateral patellar subluxation with some patellar chondromalacia [and]

mild semimembranosus bursitis but again no soft tissue tears, just moderate sprain."  *Id.*

Plaintiff had fair ROM with her left knee.  *Id.*  Physical therapy was prescribed and

Dr. Brown opined: "I think she can return back to work with a light duty.  I have asked

her to send me the Worker's Comp paperwork so I can further delineate her restrictions.

Basically I do not want her squatting or bending very frequently.  Follow up with me in a

month."  *Id.*

On June 11, 2010, Plaintiff reported to her primary care provider difficulty with

depression and anxiety, and was prescribed Lexapro.  She also reported continuing

right shoulder pain.  R. 516-17; *see* R. 31.

A June 16, 2010, right shoulder MRI indicated a small tear involving the distal

supraspinatus tendon, possibly full thickness and superimposed on tendinopathy; mild

to moderate impingement; and altered bone marrow signal about the AC joint consistent

with edema/inflammation.  R. 555.

On July 7, 2010, Plaintiff saw Peter Loeb, M.D., and reported about a one-year history of right shoulder pain.[5]  R. 411.  She received an injection for pain on May 17, 2010, but had soreness and achiness going all the way down the arm.  Dr. Loeb reviewed an MRI report from June 16, 2010, which showed a possible tear of the distal supraspinatus, possibly full thickness, with mild to moderate impingement.  *Id.*  Another injection was provided and Dr. Loeb opined that Plaintiff's symptoms may be coming from her neck, as Plaintiff was having pain with neck extension past 60 degrees.  Her cuff function was very good notwithstanding there was a finding on an MRI.  *Id.*

On July 12, 2010, Plaintiff reported to Judy Kleynen, ARNP (with Plaintiff's primary care physician) that the increased Lexapro dosage helped with her anxiety and depression symptoms.  R. 516.

On August 19, 2010, Plaintiff returned to Dr. Loeb for an evaluation of her shoulder and arm complaints.  R. 410; *see supra* at n.5.  Dr. Loeb noted, "[s]he said the pain in her shoulder 'hurts a lot,' although she is clearly having symptoms that are not only in her shoulder but also relative to carpal tunnel."  *Id.*  Dr. Loeb noted Plaintiff's dual diagnoses of carpal tunnel according to the EMG studies, and a potential rotator cuff tear in the shoulder.  *Id.*

On August 23, 2010, Dr. Leichus noted that Plaintiff was known to have bile induced diarrhea, with medication providing some improvement of symptoms but not complete resolution.  Dr. Leichus noted Plaintiff also had irritable bowel syndrome, and

---

[5]  The ALJ considered Dr. Loeb's patient notes, including the results of electromyography (EMG) studies that were consistent with carpal tunnel syndrome. R. 29.  Plaintiff did not allege in her application or at the hearing that carpal tunnel syndrome was part of her disability.  *See, e.g.*, R. 58-60, 232, 242, 269, 277, 280. Dr. Loeb's diagnosis preceded Plaintiff's alleged onset date of May 12, 2011.  R. 23. Plaintiff returned to work as a "teacher" in the Fall.  R. 409-10.

recommended an increase in the WelChol dosage and addition of HyoMax as needed with abdominal cramping.  R. 315; *see also* R. 316-23.

On September 7, 2010, Plaintiff sought emergency treatment for chest pain at Capital Regional Medical Center (CRMC), in Tallahassee, Florida.  Impressions included: chest pain, rule out coronary syndrome; hypertension; hypothyroidism secondary to thyroid ablation; cardiac catheterization three years ago; hypothyroidism; hyperlipidemia; seasonal allergy; hypokalemia; and chronic left ankle swelling.  A chest x-ray was negative.  R. 344-46, 351-56; *see* R. 350 (VQ scan; impression: low probability for pulmonary arterial embolus).  A September 8, 2010, non-exercise stress test was deemed normal with an ejection fraction of 54%.  R. 338.  Plaintiff was discharged on September 9, 2010, with a provisional diagnosis of status post unstable angina with pending nuclear stress test and hypertension.  R. 348.

On September 12, 2010, Plaintiff again sought emergency treatment at Archbold Medical Center (Archbold) in Thomasville, Georgia, for atypical chest pain with nausea and vomiting, which was deemed to be due to anxiety and hypertension.[6]  R. 358-65, 737-45.  A September 12, 2010, CT angiogram was normal, but noted incidental findings of small pericardial effusion with small bilateral pleural effusions and predominantly basilar interstitial infiltrates.  R. 372-73.  A chest x-ray from the same day indicated cardiomegaly with mild central pulmonary vascular prominence, but no overt evidence of congestive heart failure.  R. 359, 374, 405.  An EKG showed normal sinus rhythm without any acute changes.  R. 359.  A September 13, 2010, echocardiogram demonstrated a mildly dilated left atrium, trace mitral regurgitation, trace pulmonic

---

[6]  The ALJ considered the September 2010 patient notes from CRMC and Archbold.  R. 29.

regurgitation, and a small posterior pericardial effusion.  R. 370-71.  On September 14, 2010, Plaintiff was discharged with a diagnosis of non-cardiac chest pain, hypertension, dyslipidemia, hypothyroidism, hypokalemia, and small pericardial effusion.  R. 358.

On September 17, 2010, Plaintiff reported to Dr. Deem for a post-hospital follow-up.  R. 513.  She reported fatigue, but no chest or abdominal pain.  Her pain scale was 3-4/10 just with her osteoarthritis.  She was kept off work through Sunday and then to return as light duty with no lifting and no environmental extremes.  *Id.*  (This is the first of Dr. Deem's patient notes referred to by the ALJ.  R. 29.)

On October 1, 2010, Plaintiff reported to Dr. Deem with fatigue that had been ongoing for the last month.  R. 512; *see* R. 29.  Blood tests were ordered.  R. 512.  On October 7, 2010, Dr. Deem completed an "initial disability claim form" noting that Plaintiff had chest pain and GERD, with symptoms first occurring on September 7, 2010, at the time of a hospital admission.  R. 735.  He opined that Plaintiff was first disabled in September 2010, but Plaintiff was released to work part time/light duty on September 20, 2010, and released to work on October 11, 2010.  R. 736.

On October 13, 2010, Dr. Deem referred Plaintiff to cardiologist Akash Ghai, M.D., from Southern Medical Group, for ongoing chest pain.  Further tests were ordered to determine if the pain was cardiac in nature.  R. 451-53, 473-75.  An October 18, 2010, cardiac CT calcium score report indicated definite, at least moderate atherosclerotic plaque, with highly likely moderate artery disease and possible significant narrowings.  R. 447.  A November 11, 2010, cardiac CT report indicated an abnormal study; the presence of non-obstructive coronary artery disease; an estimated ejection fraction of 60%; normal left ventricular size and function.  R. 444-45, 488-89.  A

November 24, 2010, Holter monitor study indicated normal sinus rhythm present throughout the recording; occasional isolated atrial premature beats; occasional isolated ventricular premature beats; and no evidence of atrial fibrillation or flutter or of advanced heart block.  R. 433, 498.  On the same date, a carotid duplex study indicated one to 20% stenosis of both the left and right internal carotid arteries, and less than 50% stenosis of both the left and right external carotid arteries.  No significant vertebral artery disease was noted.  R. 435.  On December 21, 2010, Plaintiff saw Dr. Ghai due to ongoing chest pain with exertion, which would sometimes alleviate with nitroglycerin.  Imdur was prescribed due to possible coronary spasm.  R. 430-32, 470-72.  Dr. Ghai opined that with only mild disease on the CT scan, it was unlikely that her chest pains were due to cardiac disease.  Instead, he opined Plaintiff could be experiencing coronary spasm.  R. 432.

On December 27, 2010, Plaintiff reported to Dr. Deem with multiple medical problems including having lost some hair, chest pain, and some anxiety issues.  Her pain scale was 0/10.  R. 511; *see* R. 29.

On January 13, 2011, Plaintiff saw Dr. Deem due to continuing right shoulder pain.  R. 510, 682; *see* R. 29.  Dr. Deem noted Dr. Loeb's comment that Plaintiff needed surgery for a shoulder repair.  Plaintiff reported the pain was "getting to the point that she cannot do much of anything with it" and requested another steroid injection.  Dr. Deem told her to see Dr. Loeb.  Her pain scale was 7/10; she had pain with abduction and pain with palpation to her right shoulder.  Vicodin was also prescribed.  *Id.*; *see* R. 509 (0/10 pain scale-Jan. 27, 2011).

On January 24, 2011, Plaintiff saw Dr. Ghai after experiencing dizziness and

chest pain.[7]  R. 426-28, 467-69.  She was noted to be hypotensive and her medication

was adjusted.  Dr. Ghai noted the chest pain may be due to recurrent spasm; dizziness

probably due to hypotension; and her dose of Carizem was reduced every other day.

R. 428.  On February 9, 2011, Dr. Ghai noted Plaintiff's chest pains and dizziness were

improving with a lower dose of Cardizem and use of Imdur.  R. 423-25, 464-6.

On February 15, 2011, Dr. Loeb noted Plaintiff was still having some symptoms

around her right shoulder and requested another injection with consideration for surgical

treatment in the summer.  R. 409.  X-rays demonstrated mild subacromial changes and

hume-acromial narrowing, with mild changes in the area of greater tuberosity.  Upon

examination, Dr. Loeb noted rotator cuff symptoms with some breakaway strength.

Plaintiff would continue with therapy and an exercise program.  *Id.*

On February 24, 2011, Plaintiff saw Dr. Deem for tailbone pain, resulting in

difficulty sitting.  Naproxen and Vicodin were prescribed.  Her pain scale was 5/10.

R. 508, 680.  On March 18, 2011, and April 22 and 27, 2011, Plaintiff's pain scale was

0/10.  R. 506-07, 677-79.

On April 12, 2011, Plaintiff saw Dr. Ghai due to intermittent episodes of dull chest

pain.  R. 419-22, 460-63.  Plaintiff reported being under a lot of stress at work, resulting

in chest pain.  Dr. Ghai did not think a stress test, echocardiogram, or a cardiac

catheterization were needed.  *Id.*  On May 23, 2011, Plaintiff saw Dr. Ghai due to sharp

chest pains.  R. 415-17, 457-59.  Dr. Ghai thought she might be having pericarditis and

---

[7]  The ALJ considered Dr. Ghai's patient notes from January 2011 through
approximately August 2012.  R. 30.

recommended an echocardiogram to rule out pericardial effusion and chest x-ray to rule

out pleural effusion.  R. 415.

On May 26, 2011, Plaintiff saw Dr. Deem for low back pain and hypertension.

R. 504, 676; *see* R. 29 (ALJ discussing these patient notes).[8]  Upon examination,

Dr. Deem noted pain in the paraspinal musculature of the back and prescribed Flexeril

for spasm and Vicodin for pain.  Plaintiff also mentioned "[s]he got a note from Dr. Ghai

for her disability.  He put [sic] on vasospasm and hypertension."  However, Dr. Deem

opined, "I have a hard time believing that this is going to be permanently disabling to her

and that is what it appears he [Dr. Ghai] wrote down."  *Id.*  Dr. Deem further noted that

Plaintiff was requesting he complete a form for her.  Instead, he opined that her

vasospasm and hypertension did not qualify her for disability, and that those conditions

had stabilized.  He explained, "Yes, she does need to be able to sit down and does not

need to be up and doing a lot of very heavy physical activity but a sedentary job with a

little bit of light work would not be a problem for her.  She does have the back pain

today.  It is in the paraspinal musculature in her low back.  No radiation to it.  No bowel

or bladder symptoms.  She reports no chest pain today.  No shortness of breath."  *Id.*

Plaintiff reported her pain scale of 5/10; pain in the paraspinal musculature in her low

---

[8]  The ALJ considered Dr. Deem's patient notes from September 2010 through
May 2012.  R. 29-30.  The ALJ also

> considered Dr. Deem's acceptable, treating opinion that the claimant's conditions
> would not be permanently disabling and that she was capable of a sedentary job
> with some light work in May 2011.  I have considered this assessment only to the
> extent that it addresses the nature and severity of the claimant's impairments,
> and not as it addresses disability or [RFC] under Social Security Administration
> Standards, issues ultimately reserved to the Commissioner per Social Security
> Ruling 96-5p.  In that context, significant weight is given to his overall
> assessment based in its consistency with the overall evidence of record in this
> case.

R. 32; *see* R. 29 (ALJ discussing Dr. Deem's May 27 [26], 2011, patient notes, R. 504);
*see also* R. 123 (Dr. Walker referring to Dr. Deem's May 26, 2011, evaluation).

back; straight leg raise was negative; and she was neurologically intact.  *Id*.  Dr. Deem noted that Plaintiff was at maximum medical improvement, "moderate limitation of functional capacity, capable of sedentary work.  I think this is really about where she will stay."  *Id*.  (On April 27, 2011, Plaintiff presented to Dr. Deem with a cough and congestion.  Her pain scale was 0/10.  R. 505; *see* R. 506-07, 677-79 (0/10 pain scale-Mar. 18 and Apr. 22, 2011.))

On May 27, 2011, Dr. Loeb noted Plaintiff's right shoulder was "clearly not as bad as it was when I saw her in February [2011], but she still has some moderate symptoms."  R. 408.  She was given an injection and instructed to work on strengthening.  *Id*.

On June 14, 2011, Plaintiff's chest x-ray was a negative study.  R. 414, 485.  A July 1, 2011, echocardiogram indicated the left ventricle was normal in size and function with an ejection fraction of 60%, but with grade 1 left ventricular diastolic dysfunction, and mild left atrial enlargement.  There was mild left arterial enlargement; no significant valvular lesions or pericardial effusion.  R. 412-13, 494-95.  On July 1, 2011, Plaintiff reported no recent chest pains with Imdur and Dr. Ghai opined that Plaintiff's cardiac pain was likely related to spasm or anxiety.  R. 454-55.

On August 3, 2011, Plaintiff saw Dr. Ghai reporting recurrent chest pain, brought on by physical exertion.  R. 634.  An August 4, 2011, cardiac catheterization indicated normal coronary arteries.  R. 631.

On September 7, 2011, Plaintiff was evaluated by Philip J. DuBose, Jr., Psy.D., at the Commissioner's request.[9]  R. 557-61.  Plaintiff reported depression and anxiety.

---

[9]  The ALJ considered Dr. DuBose's psychological, consultative evaluation, and gave "little weight to [his] acceptable, examining assessment above because the

R. 558.  Plaintiff received a <u>Global Assessment of Functioning</u> (GAF) score of 52.  He

diagnosed Plaintiff with rule out (RO) malingering and depressive disorder NOS.

R. 559.  Dr. Dubose's summary and prognosis included the following:

> Ms. Saunders reported psychiatric issues of depression and anxiety.  She denied any psychiatric inpatient or outpatient treatment.  She currently takes no psychotropic medications.  In regards to family history of mental illness or substance abuse she reported a brother with alcohol issues.
>
> Ms. Saunders was asked to put forth her best effort and did not appear to do so.  She was administered the Rey's 15 Item Test of Malingering and was able to recall five of 15 items.  Based on behavioral observations and the result of this test, the results of this evaluation are believed to be an underestimate of her current functioning.
>
> Other than her minimal effort to respond to the Rey's, Ms. Saunders did not appear to be outright malingering.  She did not mention significant anxiety symptoms.  Her references to any depressive symptoms were vague.
>
> She appears capable of understanding and retaining simple instructions.  Concentration and task persistence appear adequate for carrying out simple instructions and sustaining short routines.  Social interactions are limited but she should have no difficulty relating to the general public.  Adaptation is sufficient for avoiding ordinary hazards, adjusting to changes in routine, and setting realistic goals.  Prognosis for recovery within 12 months is fair.

R. 560.

On September 12, 2011, Plaintiff was examined by Wayne Sampson, M.D., at

the Commissioner's request.[10]  R. 562-67.  Plaintiff reported having chest pain,

palpitations, back pain, shoulder pain, and progressive dyspnea and easy fatigue, such

as after mopping her floors for a few minutes.  Dr. Sampson also noted Plaintiff's left

ankle was swollen.  R. 562-64.  Plaintiff's ROM, gait and tandem walk were normal; she

---

claimant likely did not put forth her best effort during the evaluation.  Therefore, the results of [his] assessment were deemed to be an underestimate of the claimant's current functioning."  R. 33.

[10]  The ALJ considered Dr. Sampson's consultative examination results.  R. 30-32.

was able to walk on her heels and toes.  Sensation was within normal limits.  Motor

strength was 5/5 throughout, including hand grip.  Her hand dexterity was preserved.

Plaintiff also hand full ROM in her hands and fingers.  R. 563, 566; *see supra* at 12 n.5

(Dr. Loeb's notes).  Plaintiff was able to get up from a seated position without difficulty;

able to get on and off the exam table without difficulty.  Her neck had no tenderness or

spasms.  She had no back pain with flexion or extension, with some paraspinal

tenderness.  She had no tenderness or pain with ROM with her shoulders.  She had left

ankle swelling involving lateral malleolus, but no tenderness or pain with ROM.  R. 564.

Plaintiff had a negative straight leg raise while in the sitting and supine positions.  *Id.*

Dr. Sampson diagnosed Plaintiff with dyspnea and fatigue with mild exertion; history of

obstructive sleep apnea; morbid obesity; chronic lower back pain; depression/anxiety

disorder; and arthropathy of the right shoulder.  *Id.*

On October 3, 2011, Plaintiff presented to the emergency room at CRMC

complaining of sinus pain.  R. 572.  A physical examination noted in part that Plaintiff

was in no acute distress.  R. 573.  Plaintiff's extremities exhibited normal ROM; no lower

extremity edema; Plaintiff was oriented x3; and had no motor deficit.  *Id.*  Her condition

was good, prescribed Azithromycin, and she was discharged.  *Id.*

On October 20, 2011, Plaintiff had a follow-up visit with Dr. Deem for

consideration of multiple medical problems including hypothyroidism, coronary artery

disease, hypertension, anxiety, and depression.  R. 585; *see* R. 29.  She had been

taking Lexapro but had been off of it for a couple of months.  She felt she needed it as

she was having trouble "with get up and go and just does not feel like she wants to do

things."  *Id.*  She was taking Levothyroxine, Lisinopril, Zyrtec, and Flexeril at bedtime.

*Id.*  Plaintiff had osteoarthritis "that causes her a problem as well."  *Id.*  She had no other issues, including that neurologically, Plaintiff appeared grossly intact.  *Id.*  Plaintiff's pain scale was 2-3/10.  *Id.*

On October 25, 2011, Dr. Ghai noted that the cardiac catheterization showed normal coronary arteries, essentially ruling out both spasm and coronary disease.  Control of blood pressure was recommended.  R. 587-89.

On December 5, 2011, Frank Walker, M.D., a Disability Determination Service medical consultant, completed a RFC.  R. 123-26.  He determined that Plaintiff was capable of work at the light exertional level.  R. 123.  He based his opinion, in part, on hospital admissions and other treatment records, including Dr. Deem's May 26, 2011, treatment notes, R. 504.  R. 123[11]; *see* R. 32.  At the same time, Deborah Carter, Ph.D., a Disability Determination Service psychological consultant, evaluated Plaintiff's mental impairments under Listings 12.04 and 12.06.  She determined her mental impairments were non-severe and had only mild limitation in activities of daily living, social functioning and in maintaining concentration, persistence, or pace, and that Plaintiff had no episodes of decompensation.[12]  R. 120-21; *see* R. 32.

---

[11]  Plaintiff states that Dr. Walker did not "reference or address Dr. Deem's May 2011 statement of Plaintiff's limitations.  (R. 119-24, 504)."  Doc. 16 at 13.  At the top of record page 123 (Dr. Walker), although somewhat obscured by the court case number unless the header is removed, there is a reference to Monticello Family Medicine, Dr. Brian Deem, Initial, 5/26/2011, and Controlling Weight.  R. 123.

[12]  The ALJ "assigned significant weight to the opinions of the State Agency medical and psychological consultants who provide the residual functional capacity assessments discussed above."  R. 32.  The ALJ noted that her "findings are in substantial agreement with those of the State Agency consultants who also determined that the claimant was not disabled.  Although the State Agency consultants did not examine the claimant, they provided specific reasons for their opinions indicating these opinions were grounded in the evidence of record at the time the opinions were rendered.  To the degree that the conclusions of the State Agency medical consultants

On January 9, 2012, Plaintiff had a follow-up visit with Dr. Ghai.  Plaintiff's blood pressure was creeping up a little bit and Dr. Ghai suggested she start taking Bystolic. R. 593, 626.  Dr. Ghai's assessment was consistent with prior assessments with cardiovascular, extremities, and psychiatric examinations normal.  R. 594-95.  On February 2, 2012, Dr. Ghai prescribed Clonidine for Plaintiff's hypertension, which he also hoped would help her insomnia.  R. 596-97.  Plaintiff denied chest pain or shortness of breath or palpitations or dizziness.  Physical examination was normal. R. 597, 624.  On March 21, 2012, Plaintiff had a follow-up visit with Dr. Ghai and reported her blood pressure under control, but taking a lot of medicines.  She liked Clonidine because it made her sleep better.  Plaintiff denied any myalgias or arthralgias; feelings of depression.  She is taking Lexapro.  She denied palpitations or dizziness; she denied weight gain and was trying her best to lose weight.  R. 599, 620-22.  Her pain scale was 0.  R. 600, 621.  Plaintiff's depression and hypothyroidism were stable. R. 601, 622.

On May 17, 2012, Dr. Deem noted Plaintiff sought treatment at the hospital several times due to back pain, despite prescriptions of a muscle relaxer and narcotic for pain.  Physical therapy was recommended, but Plaintiff could not afford it.  Dr. Deem noted Plaintiff also had depression and anxiety.  Plaintiff's pain scale was 0/10.  Back pain was intermittent and SLR testing was negative.  Neurologically, Plaintiff appeared to grossly intact and she had no edema, cyanosis, or clubbing of her extremities. R. 606-08, 673-75; *see* R. 29-30.

---

differ from the undersigned, the reports are accorded little weight, as the opinions are based on only part of the current evidence of record."  *Id.*

On June 22, 2012, Plaintiff sought emergency treatment for lower extremity pain. An x-ray of the right hip indicated mild degenerative spurring and degenerative changes of the lower lumbar spine.  Plaintiff was released with a diagnosis of acute right-sided sciatica.  R. 610, 706-09 (Exhibit 23F submitted post-ALJ decision).

On July 19, 2012, Dr. Deem saw Plaintiff as a follow-up for multiple complaints. A history of present illnesses was noted.  A review of all systems was negative.  R. 602-05, 669-71.  He noted Plaintiff had asymptomatic primary hypertension, and noted a new diagnosis of peripheral neuropathy.  R. 602.  Her pain scale was 0.  R. 603.  On August 27, 2012, Dr. Ghai noted that Plaintiff reported doing quite well, with no new episodes of chest pain, shortness of breath, or palpitations.  R. 613.  Her physical results were normal.  R. 614-15.  Her pain scale was 0.  R. 614.  Her depression and anxiety were stable on Celexa.  R. 615.

On April 4, 2013, Plaintiff had an eye examination that showed Plaintiff was having trouble reading and seeing the television.  R. 703; *see* R. 30.  She was assessed with bilateral nuclear sclerosis and bilateral cortical senile cataracts.  R. 702.  Plaintiff elected to proceed with cataract surgery at that time.  *Id.*  Plaintiff testified she underwent surgery on her left eye on April 24, 2013, without complications and was scheduled for surgery on her right eye in May 2013.  R. 70.

### B. Post-Decision Submissions

After the ALJ entered her decision on May 22, 2013, Plaintiff's counsel submitted additional evidence.  R. 706-91 (Exhibits 23F-28F).  Some of these documents are duplicates of documents that were before the ALJ, others are not.  On December 18, 2013, the Appeals Council considered the reasons Plaintiff disagreed with the ALJ's

decision and the additional evidence, but concluded "that this information does not provide a basis for changing the [ALJ's] decision." R. 1-6. The Appeals Council denied Plaintiff's request for review of the ALJ's decision making the ALJ's decision the final decision of the Commissioner. R. 1-6.

On September 19, 2012, Plaintiff sought hospital treatment due to chest pain, dizziness, and nausea. A CT of the head indicated no acute intracranial process identified; mild atrophy and microvascular ischemic changes; and minimal chronic sinus disease. The impression of a chest view of Plaintiff was borderline cardiomegaly likely accentuated with no acute cardiopulmonary disease identified. For the most part, her physical examinations were normal. R. 713-33.

On February 27 and May 29, 2013, Dr. Ghai noted Plaintiff's coronary disease was stable. Plaintiff was doing well since her last visit. Her physical examination results were normal. Her mood and affect were appropriate. Her hypertension was worsening due to medication non-compliance. She reported she was compliant with her cholesterol medication. R. 765-68. (On February 27, 2013, Plaintiff's pain scale was 0. R. 766.)

On April 3, 2013, Dr. Deem prescribed cyclobenzaprine for Plaintiff's spinal muscle spasm. Her pain scale was 8. R. 789-91. On May 29, 2013, Plaintiff had a follow-up visit with Dr. Ghai. R. 768. She denied any flare-ups of her angina from the spasm; her blood pressure remained well-controlled as was her cholesterol; she was a little overweight so she was challenged do get her weight down and exercise; she was compliant with her medications; and she denied any myalgias, arthralgias, or ankle edema. *Id.*

On September 18, 2013, Plaintiff sought treatment for back pain with Dr. Deem.

R. 778-81.  X-rays indicated osteoarthritis of the cervical and lumbar spine.  Her

physical examination was generally normal, although inspection/palpation of her joints,

bones, and muscles were abnormal such that there was "[p]ain in the paraspinal

muscles lumbar spine and cervical spines.  SLR neg, neuro intact."  R. 780.  Her

orientation to person, place, and time was normal and her mood and affect were also

normal.  Her pain scale was 6.  *Id.*  Dr. Deem noted that Plaintiff had not been able to

go to a pain clinic due to cost.  R. 781.  Dr. Deem further opined regarding her lower

back and neck pain that Plaintiff "should be able to do non-manual labor jobs where she

can sit or stand without lifting, pushing, pulling or major exercise.  [F]ollow up after pain

clinic.  Send a note to disability attorney."  R. 781.[13]

---

[13]  Plaintiff refers to one patient note from Dr. Deem (September 18, 2013,) in which Dr. Deem opined as stated above and makes a passing argument that this evidence supports Dr. Deem's RFC assessment.  Doc. 16 at 12-13.  The Appeals Council denied Plaintiff's request for review.  R. 1-7.  The Eleventh Circuit has said that a court "when the [Appeals Council] has denied review, we will look only to the evidence actually presented to the ALJ in determining whether the ALJ's decision is supported by substantial evidence."  Ingram v. Comm'r of Soc. Sec., 496 F.3d 1253, 1265 (11th Cir. 2007) (citing Falge v. Apfel, 150 F.3d 1320, 1323 (11th Cir. 1998)).  Plaintiff does not challenge the Appeal Council's decision.  Doc. 16.  In this case, the Appeals Council, in denying a request for review, was not required "to give a detailed rationale for why a piece of new evidence submitted to it does not change the ALJ's decision."  Mitchell v. Comm'r of Soc. Sec., No. 13-15318, slip op. at 9 (11th Cir. Nov. 10, 2014) (citing Bowen v. Heckler, 748 F.2d 629 (11th Cir. 1984)).  The new evidence submitted by Plaintiff did not demonstrate the existence of a new medical condition but, instead was additional evidence of Dr. Deem's opinion regarding Plaintiff's limitations.  Notwithstanding, the Court has considered the new evidence.  This is not a case where the evidence submitted to the Appeals Council was material to the extent it offered an objective medical explanation for previously unexplained subjective complaints of pain and inability to work over any identified length of time.  Having reviewed the entire record, there is no reasonable possibility that the new evidence would change the administrative outcome.  *See* Hyde v. Bowen, 823 F.2d 456, 459 (11th Cir. 1987).

**C. Disability Reports, Pre-Hearing Representations, and Hearing Testimony**

On July 24, 2011, Plaintiff informed the Commissioner that she experienced pain when bending and walking, and did not stand too long.  R. 242, 244, 250.  She also reported dizziness, and leg cramps resulted in her only being able to walk short distances.  R. 243-44.  Plaintiff also reported that she could lift and carry about ten pounds.  R. 249, 258.  Plaintiff reported that she was "tired all of the time, this interferes because I can't keep up with the children on the playground[.] I noticed that I wasn't as energetic as I had been before I started having chest pains and shortness of breath. I couldn't do it anymore. It took a lot out of me."  R. 253.  She was able to sit through church.  R. 258.

On October 24, 2011, Plaintiff reported that, "it's very painful doing my activities of daily living.  I stop and rest during the day to cope."  R. 273.  On November 1, 2011, Plaintiff reported pain with walking long distances, and tailbone pain if sitting for a long period of time.  R. 277.  Plaintiff reported receiving help with laundry and shopping, had difficulty performing some chores, and sometimes ate pre-prepared meals when she was in too much pain to cook.  R. 278-79.

On September 11, 2013, Mattie Leland, Plaintiff's friend and former coworker provided a statement.  R. 777.  Ms. Leland noted she worked with Plaintiff from 2005 through 2009, and Plaintiff had difficulty performing her job tasks due to back and shoulder pain.  She also noted Plaintiff's frequent absences, and difficulty standing and keeping up with the children.  *Id.*

The ALJ considered portions of Plaintiff's hearing testimony at step two, when determining whether Plaintiff had any severe impairments and discussing the three

functional areas.  R. 25-27.  The ALJ also considered Plaintiff testimony when

determining her RFC.  R. 28.

> Born March 11, 1948, the claimant was close to retirement age on her alleged
> onset date.  She has alleged disability because of heart problems, back
> problems, hypothyroidism, hypertension, osteoarthritis, diverticulosis, muscle
> spasms, anxiety, and depression (3E; 9E; 12E; testimony).
>
> The claimant has described her pain as radiating sharp, stabbing chest pain,
> back and leg cramps, back pain, side pain, coccyx pain, and joint aches.  Her
> pain is exacerbated by walking, prolonged standing and sitting, and movement.
> It is relieved with medication, cortisone shots, physical therapy, and chiropractic
> treatment (4E; 6E; 11E; testimony).
>
> The claimant has alleged side effects of dizziness, leg cramps, dry mouth,
> headaches, fatigue, diarrhea, nausea, lightheadedness, and constipation from
> medications (4E; 6E; 11E; 15E; 19E; 8F; testimony).
>
> According to her testimony, the claimant is able to walk about 10 minutes at
> once; stand in one place for 5 to 10 minutes at once; and sit for 5 to 10 minutes
> at once.  It was noted, however, that the claimant was able to sit through the
> entire hearing without getting up even once.  The claimant also testified that she
> experiences difficulty reaching overhead.

R. 28.

## V.  Legal Analysis

### A.  Substantial evidence supports the weight the ALJ gave to Dr. Deem's opinions when she determined Plaintiff's RFC.

Plaintiff argues that the ALJ erred not in giving Dr. Deem's opinion "significant

weight," but in not properly interpreting his opinion to reflect that Plaintiff is only capable

of performing sedentary work rather than light work.  Doc. 16 at 11-14.

Dr. Deem was Plaintiff's primary care and one of her treating physicians.  He

began his examination and treatment of Plaintiff in and around December 1, 2008.

R. 533.  Over the course of several years, Plaintiff reported numerous ailments to

Dr. Deem including problems with her right shoulder, R. 510, 518, 682, having difficulty

with anxiety and depression, R. 511, 516-17, tailbone pain, R. 508, fatigue, R. 512,

chest pain, R. 511, low back pain, R. 504, and hypertension, *id.*, which led up to

Dr. Deem's May 26, 2011, evaluation. R. 504.  It is Dr. Deem's opinion rendered this

day that is the center of this controversy, doc. 16 at 11-14, although other issues are

raised by Plaintiff and discussed herein.  Doc. 16 at 14-17.

By May 26, 2011, Plaintiff had been examined by several physicians for a variety

of ailments and Dr. Deem referred to Dr. Ghai in his May 26th patient notes.  Dr. Ghai

had examined and treated Plaintiff for chest and cardiac-related problems prior to May

26th and for the first time on October 13, 2010, at the request of Dr. Deem.  *See, e.g.*,

R. 415-17, 419-25, 426-28, 451-53, 457-59, 460-63, 467-69, 473-75; *see infra* at 29

n.15.

On May 26th, Plaintiff presented to Dr. Deem complaining of back pain. R. 504.

Dr. Deem noted:

> She has low back pain and also hypertension.  She has had the chest pain and
> she has seen Dr. Ghai.  She got a note from Dr. Ghai for her disability.  He put
> on vasospasm and hypertension.  I have a hard time believing that that is going
> to be permanently disabling to her and that is what it appears he wrote down.
> She wants another form filled out by me in regard to her disability.  I instructed
> her that I really did not think this qualified her.  Yes, she does need to be able to
> sit down and does not need to be up and doing a lot of very heavy physical
> activity but a sedentary job with a little bit of light work would not be a problem for
> her.  She does have the back pain today.  It is in the paraspinal musculature in
> her low back.  No radiation to it.  No bowel or bladder symptoms.  She reports no
> chest pain today.  No shortness of breath.

*Id.*  Plaintiff's reported pain scale was 5/10; she had pain in the paraspinal musculature

in her low back; a straight leg raise was negative; and neurologically, she was intact.  *Id.*

Dr. Deem's assessment was low back pain and hypertension.  *Id.*  His plan provided:

At this point gave her some Flexeril 5 mg at bedtime.  Gave her Vicodin 5/500 mg q.6h. p.r.n. for pain, #20.  Otherwise keep her with other medications.  We did fill out a form that basically said she had chest pain, coronary vasospasm with hypertension, but her condition was stabilized.[14]  She has reached maximum medical improvement, moderate limitation of functional capacity, capable of sedentary work.  I think this is really about where she will stay.  Instructed to let us know if she has other problems or concerns.  We will continue to follow from there.

R. 504.  (On April 27, 2011, Plaintiff presented to Dr. Deem with a cough and congestion; her pain scale was 0/10.  R. 505.)[15]

The ALJ "considered Dr. Deem's acceptable, treating opinion that [Plaintiff's] conditions would not be permanently disabling and that she was capable of a sedentary job with some light work in May 2011." R. 32.  The ALJ "considered this assessment only to the extent that it addresses the nature and severity of [Plaintiff's] impairments, and not as it addresses disability or [RFC] under Social Security Administration standards, issues ultimately reserved to the Commissioner per Social Security Ruling [SSR] 96-5p. In that context, significant weight is given to his overall assessment based in its consistency with the overall evidence of record in this case."  *Id.*

---

[14]  On October 10, 2010, Dr. Deem filled out an "initial disability form-physician's statement," noted that Plaintiff had chest pain and GERD, and that she first consulted with Dr. Deem about this problem on September 17, 2010.  R. 735.  Dr. Deem released Plaintiff to return to part-time work on September 20, 2010.  R. 736.  Plaintiff was referred to Dr. Ghai and was examined by Dr. Ghai on October 13, 2010.  R. 451-53, 473-75.

[15]  Between 2008 and 2012, although Dr. Deem noted Plaintiff's reported pain scale several times at between two/three to seven out of a ten point scale, *see, e.g.*, R. 504, 508, 510, 513, 518, 531-32, 536, 585, Dr. Deem frequently noted Plaintiff's reported pain scale was "0/10" or "0".  *See, e.g.*, R. 505-07, 509, 511-12, 514, 526, 528-30, 535, 603, 608.  Plaintiff reported to Dr. Deem that her pain scale was "8" on April 3, 2013, R. 789-91, and "6" on September 18, 2013, R. 780.  Dr. Ghai, Plaintiff's treating cardiologist, noted Plaintiff's pain scale was at "0" on March 21, 2012, July 19, 2012, August 27, 2012, and February 27, 2013.  R. 600, 603, 614, 621, 766.  The ALJ considered numerous patient notes from Drs. Deem and Ghai, but did not note the pain scale.  R. 29-32.

The ALJ also gave significant weight to the opinion of state agency, non-examining physician and medical consultant Dr. Walker who opined that Plaintiff could perform light work.  R.32; *see* R. 123-26.  Although Plaintiff argues that Dr. Walker did not consider Dr. Deem's May 26th evaluation, doc. 16 at 13, he did.  R. 122-23; *see supra* at 21 n.11.

The ALJ properly declined to accept Dr. Deem's opinion as controlling regarding Plaintiff's RFC that Plaintiff had a limited ability to perform only sedentary work.  "[S]ome issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case, i.e., that would direct the determination or decision of disability.  The following are examples of such issues: . . . 2.  What an individual's RFC is."  SSR 96-5p, 1996 SSR LEXIS 2, at *5 (July 2, 1996).  Social Security Ruling 96-5p provides further guidance regarding the RFC assessments and medical source statements:

> The regulations describe two distinct kinds of assessments of what an individual can do despite the presence of a severe impairment(s).  The first is described in 20 CFR 404.1513(b) and (c) and 416.913(b) and (c) as a "statement about what you can still do despite your impairment(s)" made by an individual's medical source and based on that source's own medical findings.  This "medical source statement" is an opinion submitted by a medical source as part of a medical report.  The second category of assessments is the RFC assessment described in 20 CFR 404.1545, 404.1546, 416.945, and 416.946 which is the adjudicator's ultimate finding of "what you can still do despite your limitations."  Even though the adjudicator's RFC assessment may adopt the opinions in a medical source statement, they are not the same thing: A medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s).

1996 SSR LEXIS 2, at *10-11.  Additionally, ALJs have been cautioned not to assume that a medical source use of terms such as "sedentary" and "light" are consistent with the Commissioner's regulations.

> From time-to-time, medical sources may provide opinions that an individual is limited to "sedentary work," "sedentary activity," "light work," or similar statements that appear to use the terms set out in our regulations and Rulings to describe exertional levels of maximum sustained work capability.  Adjudicators must not assume that a medical source using terms such as "sedentary" and "light" is aware of our definitions of these terms.  The judgment regarding the extent to which an individual is able to perform exertional ranges of work goes beyond medical judgment regarding what an individual can still do and is a finding that may be dispositive of the issue of disability.

> At steps 4 and 5 of the sequential evaluation process in 20 CFR 404.1520 and 416.920, the adjudicator's assessment of an individual's RFC may be the most critical finding contributing to the final determination or decision about disability.  Although the overall RFC assessment is an administrative finding on an issue reserved to the Commissioner, the adjudicator must nevertheless adopt in that assessment any treating source medical opinion (i.e., opinion on the nature and severity of the individual's impairment(s)) to which the adjudicator has given controlling weight under the rules in 20 CFR 404.1527(d)(2) and 416.927(d)(2).

1996 SSR LEXIS 2, at *13-14.  Thus, even if the ALJ had not expressly rejected the RFC portion of Dr. Deem's statement, it would have been within the ALJ's discretion to determine the actual impact.  *See* Beegle v. Soc. Sec. Admin., 482 F. App'x 483, 486 (11th Cir. 2012) (unpublished) ("A claimant's residual functional capacity is a matter reserved for the ALJ's determination, and while a physician's opinion on the matter will be considered, it is not dispositive.").

The ALJ considered treatment notes from Dr. Deem from September 17, 2010, through May 2012, both before and after Plaintiff's alleged onset of disability of May 12, 2011.  R. 29-30, 32.  At various times, Dr. Deem noted that Plaintiff had a negative SLR and that she was neurologically intact, *see, e.g.*, R. 504 (May 2011); no problem found with Plaintiff's lower extremities and she was neurologically intact in October 2011,

R. 585.  By May 17, 2012, Dr. Deem noted that Plaintiff reported her pain level at 0/10; Plaintiff was taking medication for her pain; back pain was intermittent; she had no problems with her extremities; intact neurologically; and had a negative SLR currently. R. 608.  The ALJ considered Dr. Deem's notes and gave his "overall assessment" "significant weight" because it was consistent "with the overall evidence of record in this case."  Dr. Deem's evaluations of Plaintiff's physical condition, as opposed to his opinion of Plaintiff's limited ability to work (limited to sedentary work), are substantial evidence supporting the ALJ's RFC assessment. R. 30-32.

In addition to Dr. Deem's May 26, 2011, evaluations, the ALJ considered the written evaluation and opinion of examining physician Dr. Sampson.  R. 30-31; *see* R. 562-68.  Dr. Sampson examined Plaintiff on September 12, 2011, and found intact reflexes and motor strength with no abnormalities.  R. 563.  Plaintiff's ROM, gait and tandem walk were normal; she was able to walk on her heels and toes.  Sensation was within normal limits.  Motor strength was 5/5 throughout, including hand grip.  Her hand dexterity was preserved and she had full ROS in her hands and fingers.  R. 563, 566. Plaintiff was able to get up from a seated position without difficulty and able to get on and off the exam table without difficulty; had no pain but some tenderness in her back; and had negative SLR testing while in the city and supine positions.  She had no tenderness or pain with our ROM with her shoulders.  She had left ankle swelling involving lateral malleolus, but no tenderness or pain with ROM.  Dr. Sampson diagnosed Plaintiff with dyspnea and fatigue with moderate exertion; history obstructive sleep apnea; morbid obesity; chronic lower back pain; depression/anxiety disorder; and arthropathy of the right shoulder.  As noted by the ALJ, "Dr. Sampson offered no

assessment of the claimant's functional abilities (11F)."  R. 564.  Dr. Sampson's findings are additional substantial evidence supporting the ALJ's RFC assessment.

The ALJ also gave significant weight to the opinion of non-examining physician Dr. Walker.  In December 2011, and necessarily based on his consideration of Dr. Deem's May 26th treatment notes, R. 123, and other treatment records, R. 123-24, Dr. Walker opined that Plaintiff could perform light work, R. 123-24.  The ALJ was allowed to give more weight to Dr. Walker's opinion because it was supported by the record.  *See* 20 C.F.R. § 404.1527(c)(3); Fries v. Comm'r of Soc. Sec., 196 F. App'x 827, 833 (11th Cir. 2006) (unpublished) (allowing ALJ to rely on non-examining physician opinions when consistent with record).  The ALJ was permitted to weigh Dr. Deem's May 26th statement and his treatment notes, the opinions of Drs. Sampson and Walker, and other evidence in the record, including Plaintiff's statements, and to fashion a RFC assessment.

At the hearing, the ALJ questioned the vocational expert about whether someone with the same RFC and vocational profile as Plaintiff could perform her past relevant work.  R. 97-98.  The vocational expert responded in the affirmative, excluding Plaintiff's past work as a certified nursing assistant.  R. 98.  Plaintiff argues, however, that the ALJ erred by not including the limitations from Dr. Deem's opinion in the hypothetical question.  Doc. 16 at 13-14.  The ALJ properly rejected Dr. Deem's statement regarding Plaintiff's ability to perform sedentary work, so there were no credited limitations to include in the RFC assessment.  The vocational expert's testimony was substantial evidence supporting the ALJ's step four assessment.  *See* Winschel v. Comm'r of Soc. Sec., 631 F. 3d 1176, 1178 (11th Cir. 2011).  "[T]he ALJ was not required to include

findings that he properly rejected as unsupported." Clyburn v. Comm'r of Soc. Sec.,

555 F. App'x 892, 895 (11th Cir. 2014) (unpublished) (citing Crawford v. Comm'r of Soc.

Sec., 363 F.3d 1155, 1161).

The burden is on the claimant to prove that she is disabled. Bell v. Bowen, 796

F.2d 1350, 1352 (11th Cir. 1986) (citing 20 C.F.R. §§ 404.1525, 404.1526); Wilkinson v.

Bowen, 847 F.2d 660, 663 (11th Cir. 1987).  This Court's "limited review precludes

deciding the facts anew, making credibility determinations, or reweighing the evidence."

Moore, 405 F.3d at 1211 (citing Bloodsworth, 703 F.2d at 1239).  Plaintiff did not prove

she was more limited than found by the ALJ, who applied the correct standards and

properly rejected Dr. Deem's May 26th statement regarding Plaintiff's limited ability to

perform sedentary work.  Substantial evidence supports the ALJ's RFC assessment and

her assessment that Plaintiff could perform past relevant work.  R. 33-34.  No error has

been shown.

### B. Substantial evidence supports the ALJ's evaluation of Plaintiff's severe impairments.

At step two, the ALJ found Plaintiff had several severe impairments.  R. 25.

Plaintiff argues that the ALJ erred because she did not address Plaintiff's carpal tunnel

syndrome symptoms at step two or when she assessed Plaintiff's RFC.  Doc. 16 at 14-

15.

At step two, it is Plaintiff's burden to produce evidence and prove that she has

severe impairments that significantly limit her ability to perform basic work-related

activities.  See generally Hale v. Bowen, 831 F.2d at 1011.  The issue is whether the

claimant has shown that he or she has a condition that has more than "a minimal effect

on her ability to: walk, stand, sit, lift, push, pull, reach, carry, or handle, etc."  Flynn v.

Heckler, 768 F.2d 1273, 1275 (11th Cir. 1985) (relying on 20 C.F.R. § 404.1521).

Further, a diagnosis alone is not a sufficient basis for a finding that an impairment is

severe because "the 'severity' of a medically ascertained disability must be measured in

terms of its effect upon ability to work, and not simply in terms of deviation from purely

medical standards of bodily perfection or normality." McCruter v. Bowen, 791 F.2d

1544, 1547 (11th Cir. 1986).  "[I]n order for an impairment to be non-severe, 'it [must be]

a slight abnormality which has such a minimal effect on the individual that it would not

be expected to interfere with the individual's ability to work, irrespective of age,

education, or work experience.'"  Parker v. Bowen, 793 F.2d 1177, 1181 (11th Cir.

1986) (citing Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984), Edwards v. Heckler,

736 F.2d 625, 630 (11th Cir. 1984), and Flynn, 768 F.2d at 1274.[16]

Plaintiff did not allege in her application or at the hearing that carpal tunnel

syndrome was part of her disability.  *See, e.g.,* R. 44-50, 59-60,100, 135, 142, 232, 242,

269, 273, 277, 280.  Plaintiff has not shown her carpal tunnel syndrome was a severe

impairment.  The ALJ did consider the diagnosis of carpal tunnel syndrome in her RFC

finding.  R. 29.  Dr. Loeb issued this diagnosis on August 19, 2010, which preceded

Plaintiff's alleged disability onset date of May 12, 2011.  R. 410.  Plaintiff returned to

work as a "teacher" after the diagnosis, R. 409-10, which is consistent with the ALJ's

determination that Plaintiff could continue to perform her past relevant work as a

teacher's aide.  R. 33.

Plaintiff does not point to evidence showing Dr. Loeb's carpel tunnel diagnosis

limited her ability to work.  Doc. 16 at 14-15.  Dr. Sampson opined in September 2011

---

[16]  The ALJ is not required, however, to identify all of the impairments that should
be considered severe.  *See* Heatly v. Comm'r of Soc. Sec., 382 F. App'x 823, 825 (11th
Cir. 2010) (unpublished).

that Plaintiff's motor strength was 5/5 throughout, including handgrip, and her hand

dexterity was preserved; and she had full ROM in her hands and fingers.  R. 563.

Dr.  Walker also considered Dr. Sampson's findings, R. 124, and concluded that Plaintiff

had no manipulative limitations.  *Id.*  (Limitations are a crucial factor to consider in

determining whether a claimant is disabled.  *See* McCruter v. Bowen, 791 F.2d 1544,

1547 (11th Cir. 1986).)  The ALJ considered Dr. Loeb's treatment notes and the

opinions of Drs. Sampson and Walker regarding this issue when assessing Plaintiff's

RFC.  R. 29, 31.  Substantial evidence supports the ALJ's step two determination.

### C.  Substantial evidence supports the ALJ's finding that Plaintiff's statements about her symptoms were not entirely credible.

Plaintiff argues that the ALJs credibility determination is not supported by

substantial evidence.  Doc. 16 at 15-17.

In evaluating Plaintiff's RFC, the ALJ considered Plaintiff's statements about her

symptoms and the limitations they allegedly caused.  R. 27-33.  For example, the ALJ

noted Plaintiff's description of "her pain as radiating sharp, stabbing chest pain, back

and leg cramps, back pain, side pain, coccyx pain, and joint aches" and that her pain "is

exacerbated by walking, prolonged standing and sitting, and movement," although

"relieved with medication, cortisone shots, physical therapy, and chiropractic treatment.

(4E; 6E; 11E; testimony)." R. 28.  Plaintiff also "alleged side effects of dizziness, leg

cramps, dry mouth, headaches, fatigue, diarrhea, nausea, lightheadedness, and

constipation from her medications (4E; 6E; 9E; 11E; 15E; 19E; 8F; testimony)."  *Id.*

Further, the ALJ noted from Plaintiff's testimony that she "is able to walk for about 10

minutes at once; stand in one place for 5 to 10 minutes at once; and sit for 5 to 10

minutes at once.  It was noted, however, that the claimant was able to sit through the

entire hearing without getting up even once.  The claimant also testified that she

experiences difficulty reaching overhead."  R. 28; *see* R. 53, 56, 68, 73, 85-87 (Plaintiff's

hearing testimony).  The ALJ found Plaintiff's statements were "not entirely credible."

R. 28.  After summarizing the medical evidence, the ALJ also noted that Plaintiff

> continues to function adequately in a full range of routine activities of daily living,
> and maintain significant social relationships with friends and family members as
> discussed above.  Turning to the medical evidence, the objective findings do not
> fully support the degree of severity of the claimant's allegations, as the claimant's
> longitudinal medical history for reflects mainly stable findings with treatment that
> is essentially routine in nature.

R. 33.

Pain is subjectively experienced by the claimant, but that does not mean that

only a mental health professional may express an opinion as to the effects of pain.

To establish a disability based on testimony of pain and other symptoms, the claimant

must satisfy two parts of a three-part test showing: (1) evidence of an underlying

medical condition; and (2) either (a) objective medical evidence confirming the severity

of the alleged pain; or (b) that the objectively determined medical condition can

reasonably be expected to give rise to the claimed pain.  Wilson, 284 F.3d at 1225.

This is guidance for the way the ALJ is to evaluate the claimant's subjective pain

testimony because it is the medical model, a template for a treating physician's

evaluation of the patient's experience of pain.  A clearly articulated credibility finding

supported by substantial evidence will not be disturbed.  Foote v. Chater, 67 F.3d 1553,

1562 (11th Cir. 1995).

To analyze a claimant's subjective complaints, the ALJ considers the entire

record, including the medical records; third-party and a claimant's statements; the

claimant's daily activities; the duration, frequency, intensity of pain or other subjective

complaint; the dosage, effectiveness, and side effects of medication; precipitating or aggravating factors; and functional restrictions.  *See* 20 C.F.R §§ 404.1529 (explaining how symptoms and pain are evaluated); 404.1545(e) (regarding RFC, total limiting effects).  The Eleventh Circuit has stated that "credibility determinations are the province of the ALJ."  Moore, 405 F.3d at 1212 ("The ALJ may discount subjective complaints of pain if inconsistencies are apparent in the evidence as a whole.").

Plaintiff questions the ALJ's reliance on Plaintiff's testimony that she could only sit for 5 to 10 minutes, but managed to sit through the entire hearing.  Doc. 16 at 16; R. 28 (presumably referring to R. 86-87).  During the hearing, the ALJ noted that "[y]ou've been in here . . . almost an hour" and Plaintiff informed the ALJ that her lower back and coccyx (tail) bone were hurting.  R. 87.  Plaintiff refers to the ALJ's reliance on this questioning as "sit and squirm jurisprudence," which "has been long condemned by the Eleventh Circuit," citing Wilson v. Heckler, 734 F.2d 513, 517 (11th Cir. 1984).  Doc. 16 at 16.

In Wilson v. Heckler, the court disapproved of an ALJ's finding that the claimant did not experience pain because he did not appear to be in pain.  *Id.* at 517-18.  In an earlier decision, the court explained that "sit and squirm" jurisprudence occurs when "an ALJ who is not a medical expert will subjectively arrive at an index of traits which he expects the claimant to manifest at the hearing.  If the claimant falls short of the index, the claim is denied."  Freeman v. Schweiker, 681 F.2d 727, 731 (11th Cir. 1982).  The ALJ's reference to Plaintiff sitting "through the entire hearing without getting up even once" cannot be viewed in isolation.  R. 28.  It was one factor considered.[17]

---

[17]   It is proper, however, for the ALJ to consider the claimant's demeanor and appearance during the hearing as long as this is not in lieu of consideration of the

The ALJ found the objective evidence did not support the severity of symptoms Plaintiff allegedly experienced, R. 28-32, which the ALJ is allowed to consider.  20 C.F.R § 404.1529(c)(2).  Plaintiff argues that at the time of her alleged onset date, her "primary limitations were standing and walking" such that "she was able to sit through church, but her sitting limitation increased as her back pain increased over time. (R. 242-44, 250, 258)."  Doc. 16 at 16.  Plaintiff notes that by November 2011, she "reported pain with walking long distances, and tailbone pain if sitting for a long period of time" and that she "received help with laundry and shopping, had difficulty performing some chores, and sometimes ate pre-prepared meals when she was in too much pain to cook."  Doc. 16 at 16 (citing R. 277-79).

As noted by the ALJ, imaging of Plaintiff's ankle, lower spine, and hip showed only mild degenerative changes.  R. 28.  A September 2010 x-ray of the left ankle showed "minimal calcaneal spurring" with "[n]o acute findings."  R. 551.  In June 2012, imaging of the right hip showed "mild degenerative spurring" of the lumbar spine with no acute bony abnormality of the hip.  R. 610, 706-09.  In September 2011, Dr. Sampson found intact reflexes and motor strength with no abnormalities in the extremities. R. 563.  Plaintiff had normal tandem walk and could heel and toe walk.  *Id.*  Plaintiff was able to get up from a seated position without difficulty and able to get on and off the exam table without difficulty.  Her neck had no tenderness or spasms.  She had no back pain with flexion or extension, with some paraspinal tenderness.  She had no tenderness or pain with ROM with her shoulders.  She had left ankle swelling involving

---

medical evidence presented.  Norris v. Heckler, 760 F.2d 1154, 1158 (11th Cir. 1985); Macia v. Bowen, 829 F.2d 1009, 1011 (11th Cir. 1987).  "We do not accept an ALJ's mere reliance on his observation of a claimant during the hearing as the only basis upon which to reject a claimant's reference to pain."  Norris, 760 F.2d at 1158.

lateral malleolus, but no tenderness or pain with ROM.  Plaintiff had a negative SLR

while in the sitting and supine positions.  R. 564.  These rather mild findings and the

mild imaging findings of Plaintiff's ankle, spine, and hip, do not support the extent of

pain and other symptoms Plaintiff alleged experiencing while standing and walking.

The ALJ also considered Plaintiff's right shoulder impairment.  R. 28-29.  An MRI

of the right shoulder in June 2010 showed mild to moderate impingement.  R. 555.  In

August 2010, Dr. Loeb noted a potential rotator cuff tear.  R. 410.  By May 2011,

Dr. Loeb stated Plaintiff's right shoulder impairment was "clearly not as bad" as in

February 2011, but that she still had "some moderate symptoms."  R. 408.  Dr. Loeb

noted Plaintiff "has done well" with her right shoulder impairment, which required only

"general management and treatment" such as an exercise routine and strengthening.

R. 408.  The ALJ limited Plaintiff to only occasional overhead reaching with the right arm

and no overhead lifting of more than 5 pounds with the right upper extremity.  R. 27.

The ALJ also found that Plaintiff's medical history was relatively stable with

mostly routine treatment.  R. 33; *see* 20 C.F.R § 404.1529(c)(3)(v).  Plaintiff argues that

"stable does not mean not disabled," referring to Dr. Deem's statement about her RFC.

Doc. 16 at 17.  On May 26, 2011, Dr. Deem opined that Plaintiff was not disabled.

R. 504.  He opined that Plaintiff was stable in that she had reached maximum medical

improvement, moderate limitation of functional capacity, and capable of "a sedentary job

with a little bit of light work" that "would not be a problem for her."  *Id.*  The ALJ

considered Plaintiff's assertion that [h]er pain is exacerbated by walking, prolonged

standing and siting, and movement."  R. 28.  As of May 26, 2011, Plaintiff reported to

Dr. Deem that her pain scale of 5/10, but her pain scale was 0/10 on March 18, 2011,

and April 22 and 27, 2011.  R. 505-07.  Her reported pain scale to Dr. Deem was 2-3/10 on October 20, 2011, R. 585; 0/10 on May 17, 2012, R. 606-08, 673-75; and 0 on July 19, 2012, R. 603, 670; *see supra* at 29 n.15.

The Commissioner is charged with the duty to weigh the evidence, resolve material conflicts in the testimony, and to determine the case accordingly.  <u>Wheeler</u>, 784 F.2d at 1075.  Even if the Court disagrees with the ALJ's resolution of the factual issues and would resolve these issues differently, the ALJ's decision must be affirmed where it is supported by substantial evidence.  In this case, substantial evidence supports the ALJ's finding the Plaintiff's statements about her symptoms were not entirely credible.

## VI. Conclusion

Considering the record as a whole, the findings of the ALJ are based upon substantial evidence in the record and the ALJ correctly applied the law.  Accordingly, it is respectfully recommended that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **AFFIRMED.**

**IN CHAMBERS** at Tallahassee, Florida, on November 25, 2014.

s/ Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**